Good morning, Your Honor. I'm John Taylor for the Plaintiff Appellant. It's a pretty straightforward matter. I think that it's not heavy on the law. Could you speak into the microphone, please? Yes, I apologize. I'm fighting a cold. I think it's a pretty straightforward matter. I don't think it's heavy on the law. I think that the court, after making the determination that the plaintiff was a protected class member and there was a prima facie case made, then in looking at whether or not there was a justification for her termination, weighed the evidence improperly and ignored the evidence of pretext and came to a conclusion that there was nothing to do with the pregnancy. So what do you think was the strongest evidence of pretext? One, at the time that Stephanie Charles was terminated, she was on maternity leave. She was seven weeks left to go on maternity leave. Two, the people who told her said, your termination is not due to your performance, has nothing to do with performance. And that was repeated subsequent in e-mails that she exchanged with the human resources people. Those people were not the people who made the decision, right? Correct. The decision was made by a group of regional managers who supposedly sat in a room and discussed district managers, which Stephanie Charles was a district manager, right? Nine years employee, three years as a district manager. The regional managers then supposedly were going to have a reduction in force, and they were to bring forth the people who were not good performers. In the regional manager meeting, the person who last evaluated Stephanie Charles, Christian Netschke, had been terminated. In part, she was terminated because the way that she evaluated people had been found to be wanting. So supposedly on the basis of that review, her name gets added to the list. Well, counselors, it wasn't just on the basis of one review. There's a pretty long track record here and several spreadsheets. I think you're characterizing it as people sitting around one time, sitting around a table and making this decision. The termination decision, absolutely. In the reduction of force, what the argument that was put forth was that in the reduction of force meeting, there were two meetings conducted in the beginning of January of 2014. And at that time, regional managers were to bring forth the people who weren't doing well. The problem was the regional manager who was responsible and who had last supervised Stephanie Charles had been terminated. So she's not at the meeting. I understand that. Two, the person who was sitting in at that region had never met Stephanie Charles. Yes, but your client was deposed, and her testimony recognized that her performance had been found somewhat lacking in this most recent position. Compared to her arc before that was excellent, and then in the last time that she'd been reviewed, she was graded as doing well. I don't want to get you off track. Your strongest evidence of pretext is you were going through the list. You think it's that she was on maternity leave at the time. She was on maternity leave. She is told that it's non-performance based. By people, I think, who didn't make the decision. One was it was Ms. Ehlers who was a regional manager and then the HR person, but she's told by them that it was not performance based. Two, the fact that from the very beginning when she is put into the consideration, when there's the initial email correspondence that goes out, it marks and says next to her name, it says, Stephanie Charles, consider for realignment, and there's an M next to her name, and it's like, what's the M stand for?  I deposed. I took every deposition in the case. I asked every person I went to, why does it matter that she's on maternity leave? And I got five different explanations. I thought the explanations were, first of all, we need to know that at the time we sever her because that affects the severance situation. Not in the least. I'm sorry, what? Not in the least. They had to keep her on and keep her on the payroll. Pardon me? They had to keep her on the payroll throughout her maternity leave. Right. In fact, they gave her a severance package and then realized, he said, I think he said, I've got egg on my face, then realizing somewhat late that she was on maternity leave and she needed to be kept on the payroll. Right. Yes. And two, we were trying to make sure that we weren't desperately impacting any group. I mean, you do put managers in something of a bind when you have a disparate impact and disparate treatment rules because they have to look at the outcome of what they're doing to be sure that they're not going to be sued for a disparate impact. And I agree with that, except there's only one document that, in the record, which indicates where they tracked either POC, people of color, and then they supposedly tracked people who were on maternity leave. And there's an analysis of, okay, here's the overall population, regional district manager population, how many people of color are we going to lay off? There's no such tracking. Was there anybody else who was on maternity leave? I think there was one other person that was noted. Well, maybe they just eyeballed and said, well, that's obviously not a disparate impact. I heard that from one person because the other person said, I have no idea why it's there. And I said, well, why do you continue to repeat that? And then I heard, well, because if she was on maternity leave, we'd want to know that when we went out to terminate her because it might impact how we met with her. And I said, well, none of these regional managers have offices. These are all stores that are supervised that are in malls or standalone stores. So the person, the district manager, goes from store to store to store. So it wouldn't matter whether she was on maternity leave or not. If your intention was to fire her, then you were going to set up – she was going to meet you wherever you told her to meet her. They canned her in the food court of the mall. They fired her in the food – nine years of service. Well, it was definitely an unfortunate situation. But I gather they were in this unfortunate situation where they had to fire – where they thought they had to fire 30 people. But here's the thing, where I felt the judge kind of weighed the evidence. And that's the whole deal is he weighed the evidence. Here's legitimate business reason. We're having a reduction of force, right? Okay. And then there are holes in that argument because in the regional manager meeting, the RM meeting, where the names and the lists are developed in order to determine who's to be terminated, they went from person – regional manager to regional manager and said, give us your poor performers. There's nobody in that meeting to put forth Stephanie Charles's name. Nobody in that meeting? I'm sorry. I didn't hear it the last time. There's nobody in the meeting to put forth Stephanie Charles's name. The regional managers are meeting. Who are your bad district managers? Her regional manager has been fired. The one who's sitting in the room has never met her. And in her deposition, it said, I didn't put her name forward. So then how did Stephanie Charles's name come out as the number one name on the list to be terminated after the five people who are going to be terminated for cause? The number one name is Stephanie Charles with an M next to her name. How'd that happen?  Wasn't it alphabetical? Pardon me? It wasn't an alphabetical list? No. No, no, no, no, no, no. No, no, no, no. It's a – It's not like the new manager had a blank slate. Your client had a track record, right? And her name had appeared on earlier lists. No. No, no, no. No, she didn't have a track record? Or no, there was no earlier list? There was no earlier list. Just one list generated? Yes. No, no. There's an email when they're saying when you look to people that are – as they're going into January of 2014, there's an email that says, check out some of the reassignment positions here. And they put Stephanie Charles's name being assigned to the new manager and indicates that she's on maternity leave. There's no list that's generated about who's doing poorly in the company until the manager meeting, which is generated then. So is it your position that the list, the severance list at ER-164, is the only one where your client's name ever appeared? The – Is that your position? I'm sorry, Judge, what number did you say? 164. 164. She appears on 161, which is with the first email, which is 160-161. So in January of 2014, this is two – they're saying, look what happens and consider these reassignment of these people, and her name is listed with the M next to it. Then in the meeting that has now taken place, the first after-meeting of the regional managers, which is two – Excerpt of Record 2, Volume 2, 163 and 164, January 23rd, 2014, that's when she shows up as sixth on the list, and that's not alphabetical. Then on 160-161, six days later, in the regional managers, the directors of the store reporting to the assistant vice president, her name is on that again with the issue being that she's on maternity leave. Those are the only lists where her name of all – What do you mean, the issue being? Pardon me? What do you mean by the issue being? I have no clue what it means. There was an Excel sheet, and it would list the employees. The first five people were cause employees, and there was no dispute about that. And then Stephanie Charles is number six. She's next up. And the issue in terminating her, it indicates her name, her job position, I think years with the company, and then it says the issue, on maternity. Yes, but, counsel, when you say that is the issue, I mean they already had also had these earlier, as I say, evaluations where she's not a blank slate. I don't mean to be argumentative, but we've got the ER 290 to 296, the 2012 evaluation. She had a needs improvement in ten different categories. Right, but overall rating was that she was doing well. Right, and so the problem you've got, I think, is it seems to me is the one that Judge Berzon pointed out, not that this would be an easy choice. These are tough choices, but they had to fire 30 people, and I don't think you're challenging that they had a legitimate business reason in the sense that they legitimately did need to reduce their workforce. That's correct. So it's all a matter of choosing people among what they've got to deal with here. That's correct. Right. Yeah, that's correct. But you pointed to one, and there is a plethora of evaluation documents that trail Stephanie Charles, of which they have cherry-picked all of these. She had good evaluations. Yeah, thank you. And the arc of her career is good until this person, Christian Netschke. But it seems that your whole case just turns on the fact that the key piece of evidence you have is the notation of the M, the maternity. And the fact that she was doing well. Her last rating, the one that we're talking about. You said that she appears first. I'm looking at this list from 1-23-2014. Is that the first list or the second list? The second list. On that list, she certainly doesn't appear first. All right, so here's the earlier list, which is the 1-22 list. She doesn't appear first on that one either. Where are you getting the first from? Let me check to make sure. On the 1-22 list, she's about 30 people in or 20 people in. And on the 1-23 list, she is two. No, the first one is 1-61. ER-161, volume two. ER-161. I'm looking at the SCR. ER-314, 1-22. That's not a relevant list? No, I think they were numbered a bunch. Here are the DMs we discussed today, 1-22-2014. There's a different list from 1-22-2014? No, the documents were in the record at various times. All right, but the 1-22-2014 list, she's not first. She's not even close to first. I'm sorry, what's the page you cited? I'm looking at 1-22-2014. I'm looking at ER-313. Here are the DMs we discussed today. Then I'm looking at the next one is 1-23. Here's our rolling list of people we're looking at for the DM reduction. Again, she's not even close to first. These were, Gillian Delaney was a regional manager and suggested sending these over to. Here's 1-61. I see 1-61 now. And on that one, she is number eight, I guess. Yeah, she's higher on that one. Number six. Yeah, but what date was that one? That's January 29. Yeah, so that's the third list. It's not the first list. That's the last list, not the first list. The one that you cited to before. Go back and see what email was attached. I apologize. Well, the point is that maybe she was the first on one list, but not on the two earlier lists. Well, as I said, the first list is the email saying, hey, these people are being reassigned. That's January 6 of 1-14, and that's 3-20 and 3-21. And, yes, that's the one that you made reference to. That's January 6, 2014. The meetings haven't taken place yet. No. I apologize. All right, let's not do it. I mean, it's not the one I was referring to, but that's fine. Okay, you're over your time. We've been very generous here. So let's hear from the other side. I'll give you a minute for rebuttal. Thank you, Your Honors. Darren Garcia on behalf of Abercrombie Appellee. May it please the Court. As Judge Wu found, Abercrombie has no problem with employees, including district managers, taking maternity leave. The company established . . . As Judge what? Judge Wu found. Well, you don't find things in summary judgment. As Judge Wu noted. And the evidence was that 380 managers in plaintiff's store division had taken leave, maternity leave, and returned to work without issue in the couple of years preceding the reduction in force. Well, that's just evidence in your favor. So what does that tell us? I mean, there's really no dispute that you came forward with a legitimate, non-discriminatory reason, right? Correct. The reduction in force. Correct. Okay, he comes back and he says it's his burden to show that that's pretext for pregnancy discrimination, right? Correct. And he pointed to his items. Why? And he says the district court weighed these items, which is not supposed to do on summary judgment. You're not supposed to weigh the evidence. Correct. Right? Correct. Why is he wrong?  Why doesn't that create a genuine material tribal issue of fact? It's wrong, Your Honor. On pretext. Yes, Your Honor. It's wrong because accusations and opinions aren't evidence. Well, what are the opinions and what are the accusations that you're talking about? The accusation is I was terminated because I'm pregnant, and there's no evidence. Well, he points to this list and there's a big M. I'm sorry, there's a what? An M. Your Honor, they've argued that the M is direct evidence of discrimination. Direct evidence is evidence which on its face is offensive discrimination. Well, at least it's evidence of awareness, right? That they knew that she was on maternity leave, and it went somewhere into the factor. Well, I would fundamentally disagree that it went somewhere into the factor. Well, they said it did. They said that it at least was put in there in order to deal with the means by which they would, in fact, sever her. In terms of how much severance she required. Correct, Your Honor. And she obtained all of those benefits. The only evidence in terms of what went into the decision were employees' performance potential and the geographic needs in which they resided. So that's the evidentiary gap. Sure, there's M's there, and she was on maternity leave. Can we stop there? Because you kind of got derailed.  and the first allegation is that that M is direct evidence of discrimination. And I think your response, just to take them one at a time before we get to McDonald-Douglas, please. I think your response is that the M, standing alone, is not direct evidence because it requires an inference. But I want to make sure I've got that right. Well, absolutely. It absolutely is not direct evidence. I mean, you would have to make some giant inference. Counsel, it's not a trick question. I'm just trying to figure out. You didn't say much about it in your briefing, and I want to make sure I have got the entirety of your response. Yes. Is that right? Correct. The M is not direct evidence. It's innocuous on its face. It is not a patently offensive term. She was pregnant. As the district court said, what should they have said? Well, it's actually very important evidence of at least the fact that they knew this. Well, they absolutely did know it. They, in fact – And that everybody making the decision, not just the people directly dealing with her. Absolutely. They knew it. They even afforded her an earlier leave when she had to go out earlier on leave because of an accident. So they knew full well – Well, I'm talking about the individuals making the decision. I mean, you start talking about they. You're talking about a corporation with all different – Absolutely. But the actual people making the decision knew this. The testimony on that point was – I mean, these are lay people making the decision. They wanted to be aware. They checked with the legal department. They checked with human resources department. I believe one of the decision makers testified. She said, I don't know the legalities of this. We need to have it looked into. And they wanted to be aware, as the human resources person said, that they were not having any type of disparate impact on any type of protected category. And that was run up the flagpole. They were advised, and they made their decision. That's the extent of the – Okay, so he says there's the M. All right, and so maybe it's not direct evidence of discrimination, but it's, you know, it's in the basket. Okay, and he says, they say, well, her ratings, she was rated – what was it? Doing well. Doing well. Doing well. Yes. And they had told her earlier that she wasn't being terminated for poor performance. Okay. So why doesn't that also raise an inference that just maybe they selected her because she was pregnant? Well, again, the evidence is that, as Judge Christin pointed out, she is in a declining state of performance once she reaches this level. By her own testimony, the job gets tougher the higher that you go. She received annual reviews, mid-year reviews, did self-reviews, where she even herself was self-critical of certain of her shortcomings at this higher level. So can we talk about that for a minute? There's an August 2011 rating, Leadership Touch Base Worksheet, and that was prepared by a different regional manager, Wattamall. Megan Wattamall, yes, Your Honor. Wattamall got a 2B rating, medium potential. I think that's sort of a medium. Medium, medium. Yeah, medium potential, medium performance. Medium performance, right. And then September 2013, how do you pronounce this manager? Netschke. Netschke. This is the person the opposing counsel is taking issue with her evaluation skill. But anyway, that's a 3B, low potential, medium performance. Yes. Right. And there's one other person, Derek Kaufman, I believe, who got the same rating. Yes. Okay. So understanding this is all sort of relative because they have to make very difficult decisions, what's the next bullet point I should be looking at the trajectory of her performance here? That was the last notation of her performance, the last snapshot of her performance before the reduction. Okay. So then I have more than one list here, and I want to make sure that I've got this right. I have this list, the severance list at ER 164 with an M on it. But then on January 29th of 2014, there's another list in Excel spreadsheet form. Yes. And she appeared on that list? Correct. Was there a third list? I believe there may have been another. The process was this. In late 2013, understanding that they were going to go through this reduction in force, they met knowing that regional managers were going to be dismissed as well. Yes. They met with them. Who's them? I'm sorry. The directors met with the regional managers to gather input on the performers in their regions, district managers who would be subject to the RIF, and they needed to get that because the regional managers were going to be let go as well. At that meeting, the testimony is, and this is what counsel did not make clear to you, Kristen Netschke identified her two bottom performers by name. It seems to me this plaintiff was on every list. Correct. So that's my first question. Okay. Go on with it. You explain. This is helpful. Go ahead. They received that input. Okay. They all talked about it. Then they meet again in mid-January, and this is after the regional managers who were let go are gone. So you have just the regional managers who made it through the RIF, now talking about district managers who would be let go. From that meeting, a list was generated. Ms. Charles was on that list. She'd already been. Go ahead. Okay. But this is now a new person who's there for her regional manager, right? This was Ms. Ehlers, who had just returned from maternity leave, was going to be the regional manager of that region. Yes. Okay. So she comes out of that meeting on that list. That then goes to the directors and said, hey, here's another level up. Here's our list, and the directors then need to decide, do they agree? They're the ultimate decision makers, the two mothers, Bonnie Costello and Dina Schilling, and can we afford, from a business perspective, to lose these people in these particular regions? Can the region sustain this? Now, L.A. had to let go of two people. So that really wasn't as much of a concern in L.A. But she made it then on the final list then, I'm sorry, the list that went from them then to HR to, you know, make sure that we're all good here. And then you had your final termination list that was blessed. So is that three lists? I believe that is three. All right. But in any event, she's on each list. Now, at the meeting in which she was terminated, Ms. Ehlers was there who had just come back from leave, and Mr. Sterling, who's in HR, they were not decision makers. The decision makers were two women, both mothers. They were tasked with telling people that they were being let go. Tough job. But Ehlers had to have something to do with her being on that list. No, Your Honor. No? Why? Because she was placed on that list by virtue of feedback from her regional manager, Kristen Netschke, before Netschke was let go. So opposing counsel is right when he says they sat around the meeting he was talking about. The person there as her regional manager was going to be much less familiar with her historical work performance. Well, at that meeting, but that's not the testimony was. I mean, if they were solely focused on that snapshot in time, then she was going to be the only person talking about it. I'm not suggesting there was a snapshot in time. Right. My view is that they, of course, had to look at her historical performance. His point is just that the person at the table was less familiar with her work. Correct. And with everybody else in that region, because she was just stepping into it coming off of leave. But the person who was familiar with it, Kristen Netschke, who downgraded her in performance, downgraded her in potential, sat in a meeting and said, Stephanie Charles is one of my two worst performers. And the second one was some guy who wasn't let go. Derek Hoffman was, he was on the, received in that, the last nine box they call them, did have the same score as her. Obviously our position is that argument's been waived. I understand that. And it wasn't brought up. But, you know, again, that's a snapshot. We don't know what his performance trajectory was. There's not a single performance review of his in the record. And he was tasked on that same, I'm sorry, tabbed on that same sheet, that piece of paper with being eligible or in consideration for a job at the home office. Well, it seems a little weird, but I understand it wasn't litigated. Yeah. I mean, you know, apples and oranges. Well, we don't know who's apples and oranges. Yeah, we don't. That's not quite a fair statement. Well, what is fair is that there is no record with respect to Mr. Hoffman in Washington that rating. And he was tabbed for a different position, whereas Ms. Charles was constrained. Well, but that's a, I mean, that's circular. I mean, if he's being treated better than she is even at that point, then that's a question. But I understand it wasn't litigated. Correct. So as I understand the argument here of what the district court did is it took a look at, just as you've explained, what evidence they had in the rebuttal to it and said, look, you look at all the evidence they've presented to raise a tribal issue of fact as to pretext. It just doesn't add up. Right? They had some evidence, the M, the ratings, whatnot. They had some evidence, and the district court said it just doesn't add up. No reasonable trier of fact could ever find that pregnancy was a factor in her determination. Did the district court err in doing that? No, Your Honor. Some evidence. Well, I think as a matter of law, the M is not direct evidence. As a matter of law, statements made by non-decision makers. It's circumstantial evidence, correct? Which is how you get to McDonald's, right? Well, no. I mean, I would argue no. But if you want to go down that route, I mean, there's still no evidence of pretext. There's no evidence that her being on maternity leave was a specific and substantial reason for her termination. Zero. Well, they've pointed to factors or pieces of evidence that they believe create a tribal issue of fact. They may have, but as a matter of law, the things to which they point don't. No. Well, I don't want to argue with you how you do summary judgment. But the point is, they presented some evidence. And in the district court's judgment, that evidence as a matter of law wasn't sufficient to create a tribal issue of fact. And therefore, and he reaches that conclusion by saying no reasonable trier of fact could ever agree with that position that there was discrimination. Now, I just, you know, I find that, you know, I did that as a district judge. I see it all the time. But I always find that frustratingly difficult, because these cases are not going to trial when they really should be going to trial. That's a statement of frustration on my part. Understood, Your Honor. But isn't the answer to the question yes, that what the district court judge did is say this just doesn't add up to a legitimate issue of fact? Yes. Yes, it exercised, Judge Wu exercised his gatekeeper function, said it doesn't add up. Let's go back briefly in terms of the pretext. In some ways, the thing that bothers me the most was that when she asked them what the reason was, they said you're a great employee and it wasn't your performance. I mean, that's sort of the definition of pretext. They weren't telling her the truth. They were telling her something that wasn't true. And Aylor was involved in all the second set of lists, no? She was involved with her peers in generating lists for consideration by the people who would make the decisions. Correct. So to say she wasn't involved is not true. She was involved. She knew that Stephanie Charles was on that list, at least in part because of her performance. She wasn't being fired, I understand that, but she knew that. Correct. And the testimony was from Ms. Aylor's that just very humanly she was caught off guard and was trying to be nice. And she lied. Well, and be briefly, Your Honor, there were several people on that list terminated for performance reasons, as counsel pointed out. I understand that. But she told an at least partial untruth because, in fact, performance had a lot to do, almost everything to do, with why she was on that list. Even if the court were to view her statement as a lie or an untruth, the cases that we cite in our briefs say that the statutes prohibit discrimination, not lies. So even if this non-decision maker was untruthful with her, giving her the benefit of the doubt to be nice and being caught off guard, that does not arise to evidence that would create pretext sufficient to survive summary judgment. Well, I don't understand why it's even a falsehood. To say that somebody wouldn't be terminated because of their performance, even though their performance needs improvement, that's sort of one thing. And it's quite something else. When 30 people have to be cut and we have to make the decision, then we look at folks who otherwise wouldn't have been let go because of performance. But since they have to be sort of rated against each other and 30 have to be selected, then the performance becomes the yardstick. Okay. Thank you, Your Honor. Thank you, counsel. We appreciate your argument. We'll give you a short rebuttal minute. Just make your points. So it would be helpful to me to go back over what you think are your best points. The M, the lie at the meeting. What else? I apologize. I didn't catch the second. The M, the misstatement or the partial misrepresentation at that meeting, at least by alias. What else? At the time when she was terminated, there were follow-up e-mails with her in which they told her your job was eliminated, your position was eliminated, which was not true. They gave it to the 21-year-old girl who she had trained and replaced her. So that, the fact that her performance, although what they said was we looked at this one nine-box performance. That's the only thing, Judge Kristen, that they said that they looked at in these two meetings. But there's certainly a record to support the fact that her last longer performance review wasn't so hot and that this one was one of the two lowest. So that's not very helpful. What else? Okay. The fact that in the same performance that wasn't so hot, there is the comment by Kristen Netschke to that she's interested in going back to Ohio but to work in loss management, prevention loss, loss management, like an asset shrinkage position. And that she was being recommended for that position. This was a month before the time that they had the meetings in which the bad people were supposedly to be vetted and brought forward. And there are four lists that she's put on. There is the three that you enunciated and then the last one, which is in response to your earlier question, Judge Berzon, it's 172. And that's the one that measured the disparate impact for people of color against the population, 172. So there was no list that was measured. There was no time where maternity was used as a tool. From what I could tell, in the final list, she was the only person with an M. Right. So what were they going to measure? Eyeball it and there you are. And why then couldn't that have easily come out of somebody's mouth? And I'm sure the jury will find it completely persuasive. In some of the earlier lists there were other people with M's, but in the end she was the only one. But the hole that the judge filled in, the district court filled in, was in these meetings. There's only two meetings in which the HR people in the creation of these lists are being passed from the regional manager to the store directors. HR didn't do one thing, didn't change anybody on the list. This never went through a legal department. They said that, and that's why they never put it in their papers. It never went to a legal department. So what happens in those team meetings is the key thing. We're going to put together the 16 regional managers to talk about your bad district managers. Who do you have? The person who was the regional manager got fired because she didn't know how to evaluate people, and the second person hadn't supervised her long enough. Okay. Thank you, counsel. We appreciate it. Thank you for your arguments. The matter is submitted at this time. Yes. Thank you.
judges: Paez, Berzon, Christen